IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

NOV 1 3 2003

CLERK, U.S. DISTRICT COURT

By _____

Deputy

| | | |
|---|---|---|
| RECURSION SOFTWARE, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 3:02-CV-0736-N |
| | § | |
| GENERAL MOTORS CORPORATION | § | |
| and ONSTAR CORPORATION, | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS' BRIEF IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT

A. Erin Dwyer
State Bar No. 06302700
Parker D. Young
State Bar No. 22204050
John M. Barcus
State Bar No. 24036185
**FIGARI, DAVENPORT & GRAVES, LLP.**
3400 Bank of America Plaza
901 Main Street
Dallas, Texas 75202
TEL: 214-939-2000
FAX: 214-939-2090

## **TABLE OF CONTENTS**

Table of Contents ..................................................................................................................ii

Table of Authorities ...........................................................................................................iii

I.      Introduction.............................................................................................. 1

II.     Bases of the Motion ................................................................................. 4

III.    Grounds of the Motion............................................................................. 4

IV.     Statement of Undisputed Facts ................................................................ 5

V.      Argument and Authorities ...................................................................... 13

VI.     Conclusion ............................................................................................. 24

Certificate of Service ......................................................................................................... 25

## TABLE OF AUTHORITIES

### FEDERAL CASES

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986) ................................................................................... 19

Hy King Assocs., Inc. v. Versatech Manuf. Indus., Inc.,
    826 F. Supp. 231 (E.D. Mich. 1993) ................................................. 15, 16

Riley v. Hewlett-Packard Co., 48 U.C.C. Rep. Serv. 2d 387, 36 Fed. App'x 194,
    196 (6th Cir. 2002) ................................................................................... 15

Vaughan v. Hartford Cas. Ins. Co.,
    277 F. Supp. 2d 682 (N.D. Tex. 2003) .................................................... 19

### STATE CASES

Jankowski v. Jankowski,
    18 N.W.2d 848 (Mich. 1948) .................................................................. 15

Pinto v. General Motors Corp.,
    1999 Mich. App. LEXIS 2172 (Dec. 10, 1999) ...................................... 16

Quality Prods. and Concepts Co. v. Nagel Precision, Inc.,
    666 N.W.2d 251 (Mich. 2003) ........................................................... 18, 19

Roberts v. Mecosta Co. Hosp.,
    642 N.W.2d 663 (Mich.  2002) ................................................... 20, 22, 23

St. Clair Int. Sch. Dist. v. Int. Educ. Ass'n,
    581 N.W.2d 707 (Mich. 1998) ................................................................ 15

Wilkie v. Auto-Owners Ins. Co.,
    664 N.W.2d 776 (Mich. 2003) ................................................................ 15

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RECURSION SOFTWARE, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 3:02-CV-0736-N |
| | § | |
| GENERAL MOTORS CORPORATION | § | |
| and ONSTAR CORPORATION, | § | |
| | § | |
| Defendants. | § | |

Defendants General Motors Corporation ("GM") and OnStar Corporation ("OnStar") (collectively, "Defendants") file this Brief in Support of Motion for Partial Summary Judgment ("Motion") and state:

## I. <u>INTRODUCTION</u>

This suit arises from the Defendants' licensing and use of a computer software program known as "Voyager," which was originally developed and copyrighted by ObjectSpace, Inc. ("ObjectSpace"). OnStar licensed Voyager from ObjectSpace in 1999 for use in the computer system developed by OnStar to provide in-vehicle communication services to its customers. OnStar also purchased from ObjectSpace annually renewable maintenance and support for the Voyager software. Pursuant to the maintenance agreement, OnStar purchased software maintenance from ObjectSpace in 2000 and 2001, and paid $350,000.00 per year for such services.

---

In late 2001, ObjectSpace sold certain assets to Plaintiff Recursion Software, Inc. ("Recursion"), including the intellectual property rights associated with Voyager. ObjectSpace also purportedly assigned to Recursion its on-going contractual obligations to provide software maintenance and support services to OnStar. Significantly, although the agreements between OnStar and ObjectSpace clearly provided that they could not be assigned by ObjectSpace without OnStar's prior written consent, no such consent was ever sought or obtained in connection with the alleged transfer to Recursion of ObjectSpace's maintenance obligations.

Within weeks after acquiring the ObjectSpace assets, Recursion began demanding that OnStar pay it $350,000.00 for an additional year of maintenance services on Voyager. OnStar, however, had already determined that the maintenance services that had been provided by ObjectSpace were inadequate, that the Voyager software should be removed and replaced in the OnStar system, and that OnStar therefore no longer had a need for future maintenance services from ObjectSpace, much less the newly formed Recursion entity, whose "support" team constituted a mere shell of the much larger support staff formerly employed by ObjectSpace.

After OnStar notified ObjectSpace and Recursion that it no longer intended to purchase maintenance for Voyager, Recursion claimed that OnStar's failure to purchase additional maintenance was a breach of the Voyager license. Recursion subsequently

purported to terminate OnStar's license to use Voyager and brought its claims herein for breach of contract and copyright infringement.

Counts Three and Six of Recursion's First Amended Complaint both depend on Recursion's allegation that OnStar's failure to purchase additional maintenance breached the maintenance contract purportedly assigned by ObjectSpace to Recursion.[1] As shown below, however, these claims fail as a matter of law for several reasons. First, because Recursion failed to obtain OnStar's prior written consent to the assignment of ObjectSpace's maintenance obligations, Recursion is not a valid assignee and cannot step into ObjectSpace's shoes to assert any claims relating to the maintenance arrangement. Indeed, under the asset purchase contract between Recursion and ObjectSpace, the lack of consent by OnStar prohibited Recursion from even acquiring the maintenance contract in the first place. While Recursion will undoubtedly attempt to excuse its failure to obtain OnStar's consent by arguing that OnStar somehow waived its consent rights, there is simply no evidence sufficient to raise a genuine issue of material fact regarding waiver. Finally, even if it is assumed that Recursion was a proper assignee of ObjectSpace's maintenance agreement with OnStar (which it was not), the evidence conclusively proves that (i) OnStar was not obligated to purchase another year's worth of maintenance from

---

[1] The primary focus of this suit deals with the scope of the December 1999 software license agreement and the nature of OnStar's intended and permitted uses of Voyager thereunder; however, the parties' respective claims and defenses regarding the scope of the license involve disputed issues of fact and, thus, are not included as part of this motion for partial summary judgment.

Recursion, (ii) OnStar properly decided not to renew the maintenance agreement, and (iii) Recursion's claims are therefore unfounded.

## II.   **BASES OF THE MOTION**

This motion is based upon the pleadings and other matters on file herein, together with all of the items contained in the Appendix being submitted contemporaneously herewith, including the excerpts and exhibits from the depositions of David Norris and Paul Lipari, and the affidavits of Bruce Radloff, Tyrone Beltramo, Jr., and Richard Heines. Citations to the evidence are indicated by the designation "App." followed by the appendix page number.

## III.   **GROUNDS OF THE MOTION**

Defendants are entitled to the entry of a partial summary judgment based upon the following grounds:

1.   Because OnStar's consent to the assignment of ObjectSpace's software maintenance obligations was not properly obtained, Recursion is not a valid assignee of the contractual rights it purports to assert and therefore lacks standing to bring the claims set forth in Counts Three and Six;

2.   Because OnStar's consent to the assignment of ObjectSpace's software maintenance obligations was not properly obtained, the alleged contractual rights asserted in Counts Three and Six were never actually assigned to Recursion by its predecessor, ObjectSpace, pursuant to the terms of the Asset Purchase Agreement

between ObjectSpace and Recursion.  Accordingly, Recursion does not own the claims asserted herein and lacks standing to pursue those claims;

3.    There is no evidence that OnStar gave or waived its consent to the transfer between ObjectSpace and Recursion or, alternatively, no reasonable jury could find in favor of Recursion on those issues;

4.    Even if Recursion was a proper assignee of the maintenance agreement between OnStar and ObjectSpace, OnStar was not obligated to purchase that maintenance. Accordingly, since OnStar validly chose not to renew the maintenance agreement for the period in question, Defendants did not breach any agreement with Recursion; and

5.    Recursion's claim for copyright infringement in Count Six is premised upon the purported termination of Defendants' software license, which was in turn based upon the alleged breach of contract for non-payment of maintenance fees.  Since Defendants did not breach any agreement with Recursion for the reasons described above, the purported termination of the license was invalid and Recursion's copyright infringement claim fails as a matter of law.

## IV. STATEMENT OF UNDISPUTED FACTS

### A.    The Parties.

GM is the world's leading manufacturer of automobiles.  OnStar, formerly a division and now a wholly-owned subsidiary of GM, manufactures and markets the in-

vehicle communication system known as OnStar. Recursion is a computer software and services company; Recursion came into being in late 2001 after purporting to purchase some of the assets of ObjectSpace, which shortly thereafter filed bankruptcy and ceased active business operations. [App. at 4].

## B.     ObjectSpace and the Development of the Voyager Software.

At the heart of this lawsuit is "Voyager," a computer software program developed and copyrighted by ObjectSpace. [Amended Complaint at 3]. Voyager is a "middleware" program that allows other hardware or software applications to communicate across the spectrum of an entire organization or network, without regard for the nature of the "platform" on either end. [App. at 23-25]. Prior to December 2001, ObjectSpace owned the intellectual property, patents, and copyrights associated with Voyager. [App. at 5].

## C.     The June 1999 License.

In April 1999, OnStar became interested in obtaining a license to use the Voyager software, and presented a Request for Quotation to ObjectSpace. [App. at 126]. After negotiations between the parties regarding the scope and duration of the license, OnStar issued a purchase order to ObjectSpace dated June 30, 1999, to acquire a "development license," a two-year "deployment license," and annual maintenance. [App. at 31-36]. As explained by ObjectSpace's CEO, David Norris ("Norris"), maintenance in this context means the provision to the licensee of periodic updates of the software and support

services, including technical investigation and corrections of software flaws or "bugs." [App. at 7-8].

**D.      The December 1999 License Negotiations.**

During late 1999, ObjectSpace and OnStar engaged in additional negotiations with respect to a perpetual license for OnStar's use of the Voyager software throughout its entire enterprise.   [App. at 6].    ObjectSpace and OnStar reached an agreement on December 23, 1999, pursuant to which, among other things, OnStar paid ObjectSpace a licensing fee in excess of two million dollars – the single largest licensing transaction ObjectSpace ever completed. [App. at 25a, 55-58].

**E.      The 90-Day Warranty Period and Subsequent Maintenance.**

As part of OnStar's purchase of the perpetual license in December 1999, ObjectSpace warranted the Voyager software to be free of defects for ninety (90) days. [App. at 44-45].   During that 90-day period, ObjectSpace was required to provide maintenance and support services to OnStar at no charge.   [App. at 15, 44-45]. Thereafter, ObjectSpace was obligated to provide such services upon OnStar's request "at the applicable charges set forth in the Purchase Order."   [Id.].   For future maintenance after the expiration of the warranty period, the parties agreed to the following pricing and payment terms:

> Maintenance:  $350,000, due 2nd day, 2nd month from Purchase Order Date, pre-paid annually on anniversary date, 2nd day, 2nd month.  Each year of maintenance not to increase more than pervious [*sic*] years Consumer Price Index.

[App. at 58].

**F.    The March 31, 2000, Purchase Order for Software Maintenance.**

On March 31, 2000, after the 90-day warranty period expired on the Voyager software, OnStar issued its purchase order to ObjectSpace for maintenance services relating to Voyager. [App. at 140]. In accordance with the parties' agreement, payment for the first year's annual maintenance services was due on May 2, 2000 (*i.e.*, the second day of the second month after the purchase order date). [App. at 55-57]. The following year, 2001, OnStar paid ObjectSpace another $350,000, renewing the maintenance agreement and thereby extending the maintenance period through March 31, 2002. [App. at 158].

**G.    The Terms and Conditions of OnStar's Purchase of Maintenance.**

All of the purchase orders issued to ObjectSpace by GM and OnStar, including the March 2000 purchase order regarding maintenance services, expressly included GM's General Terms and Conditions dated September 30, 1998. [App. at 140]. ObjectSpace acknowledged receipt and acceptance of the Terms and Conditions. [App. at 15a-15b, 140]. Those terms and conditions include the following provisions:

> **26.    NO IMPLIED WAIVER:**
> The failure of either party at any time to require performance by the other party of any provision of this contract shall in no way affect the right to require such performance at any time thereafter, nor shall the waiver of either party of a breach of any provision of this contract constitute a waiver of any succeeding breach of the same or any other provision.

---

**27.    NON-ASSIGNMENT:**
Seller may not assign or delegate its obligations under this contract
without Buyer's prior written consent.

**29.    GOVERNING LAW; JURISDICTION:**
This contract is to be construed according to the laws of the country (and
state/province, if applicable) from which this contract is issued as shown
by the address of Buyer . . . [.]

[App. at 141-47].

## H.    The Maintenance Agreement is Cancelable Annually.

The "Statement of Work" attached to the December 1999 purchase order sets forth

certain specifically negotiated business terms of the agreement between ObjectSpace and

OnStar.  [App. at 58].  In the Statement of Work, the parties expressly provided that the

perpetual license of the Voyager software is "non-cancelable, non-refundable, and non-

transferable."    [Id.].    Likewise, OnStar's purchase of computer consulting services

included in the Statement of Work is "non-cancelable, non-refundable, and non-

transferable."  [Id.].  In contrast, the terms applicable to OnStar's purchase of software

maintenance for Voyager has no such constraints.  Instead, consistent with the normal

practice in the computer industry, OnStar's purchase of maintenance services was subject

to annual renewals at the option of OnStar – that is, it was not "non-cancelable."  [App. at

9-14, 58].  As explained by Norris, who was personally involved in the negotiations

between OnStar and ObjectSpace in 1999, OnStar's decision whether to renew the annual

maintenance was "an option that they would have and they could choose to or not."

[App. at 9-14].

## I.    OnStar's Problems with Voyager.

During 2000 and 2001, OnStar repeatedly encountered problems with Voyager that in turn created problems with the reliability and stability of OnStar's entire computer system. [App. at 152-53]. Indeed, on many occasions, Voyager caused system crashes that hampered OnStar's ability to provide services to its customers. [Id.] Despite OnStar's purchase of maintenance services from ObjectSpace, however, many of the Voyager problems were not being addressed in a timely manner. [Id.].

## J.    OnStar Decides to Replace Voyager and Discontinue Maintenance.

Due to the problems associated with Voyager, OnStar began to examine its alternatives. After evaluating the various options available to OnStar, OnStar decided to replace Voyager when it became feasible to do so. [App. at 152-53]. As previously noted, one of the primary reasons maintenance services are purchased is to obtain new, updated releases of a particular computer program. [Id.]. In this case, since OnStar did not intend to continue using Voyager indefinitely, OnStar had no need or desire to implement any upgrade to the version of Voyager that it was already using. [Id.]. Given the decision to replace Voyager, as well as the inadequate support services that were being provided by ObjectSpace, the decision was also made by late 2001 or early 2002 not to purchase any further maintenance services for Voyager after the expiration of the maintenance period that had already been paid for. [Id.]. Accordingly, OnStar no longer desired any such services from ObjectSpace [or any other party, such as ObjectSpace's

unapproved assignee, Recursion Software, Inc.,] and that decision was communicated by OnStar. [Id.].

K.    **ObjectSpace Transfers Certain Assets to Recursion.**

On December 20, 2001, without providing any advance notice to OnStar, ObjectSpace entered into an Asset Purchase Agreement with Recursion.[2]    Under the Asset Purchase Agreement, ObjectSpace purportedly sold various assets to Recursion, including the Voyager copyrights and other related assets.    [App. at 65].    Recursion also purportedly assumed ObjectSpace's existing software maintenance obligations.    [App. at 66].

Notably, the Asset Purchase Agreement between the parties expressly excluded any ObjectSpace asset whose transfer would require the consent of a third-party unless and until that consent was obtained:

> To the extent that any assignment . . . of Intangible Personal Property . . . would require the consent or waiver of the issuer thereof or the other party thereto or any third party, which has not already been obtained, . . . this Agreement shall not constitute an assignment . . . unless and until such consent or waiver is obtained.

[App. at 69].

---

[2] In early 2002, ObjectSpace filed a Chapter 7 bankruptcy proceeding in the Northern District of Texas and ceased doing business.  To the extent necessary for this motion, Defendants request the Court to take judicial notice of the pleading and other materials on file in ObjectSpace's bankruptcy proceeding, *In Re ObjectSpace, Inc.*, No.  3-02-32943 (Bankr. N.D. Tex.).

**L. OnStar Has Never Consented to the Assignment of the Maintenance Agreement.**

Despite the clear non-assignment provision applicable to OnStar's purchase of maintenance services from ObjectSpace, neither Recursion nor ObjectSpace ever sought or obtained the Defendants' prior written consent to the assignment of the maintenance agreement; indeed, there is no evidence that any such consent was ever obtained or that the Defendants ever waived the consent requirements contained in the General Terms and Conditions applicable to the parties' agreements:

- Recursion never asked for Defendants' consent to the assignment [App. at 26]

- Recursion never obtained OnStar's consent to the assignment [Id.]

- ObjectSpace acknowledged the need to obtain consent [App. at 15c]

- ObjectSpace did not seek consent from GM or OnStar [App. at 15d-15e]

- ObjectSpace does not know of any consent actually obtained [App. at 15f]

- No person at OnStar with authorization to give consent actually gave OnStar's consent to the assignment [App. at 149]

- No person at OnStar, even without authority, consented to the assignment [Id.]

**M. Recursion's Demands for Additional Maintenance Fees.**

Even though Recursion never sought or obtained OnStar's prior written consent to the assignment of ObjectSpace's maintenance obligations, and even though any payment for a renewal of the annual maintenance agreement for a third year would not have been

due until May 2, 2002 (assuming OnStar had chosen to renew the agreement for another year, which it had not), almost immediately after the transfer of ObjectSpace's assets Recursion began to demand that OnStar pay for a third year of maintenance at a price of $350,000.00. [App. at 158-59].

**N.    Recursion's Purported Termination of the License.**

When OnStar refused to purchase maintenance services from Recursion, Recursion purported to terminate OnStar's license based upon the non-payment of maintenance fees. [App. at 160].

## V.  ARGUMENT AND AUTHORITIES

Recursion has asserted at least two causes of action involving the Defendants' non-payment of maintenance fees.  Count Three of Recursion's First Amended Complaint alleges a claim for breach of contract based upon the non-payment of a maintenance fee for the third year, and seeks nearly $4,000,000 in damages as a result of this purported breach.  In Count Six, Recursion asserts a copyright infringement claim premised upon its purported termination of the entire Voyager license for alleged non-payment of required maintenance fees.

Each of these claims, however, fails as a matter of law for several reasons:  (1) ObjectSpace assigned the maintenance obligation to Recursion without OnStar's prior written consent, in violation of the applicable terms and conditions of the parties' agreements;  (2) alternatively, pursuant to the express terms of the Asset Transfer

Agreement between ObjectSpace and Recursion, the failure to obtain OnStar's prior written consent to the transfer of the maintenance agreement resulted in that contractual obligation remaining with ObjectSpace, which in turn means that Recursion never acquired legal standing to demand payment from OnStar or to assert the aforementioned claims brought herein; (3) there is no evidence that Defendants' waived the written consent requirements of the General Terms and Conditions or, alternatively, a reasonable jury could not find that any such waiver occurred; and (4) OnStar had the option to either renew or not renew the maintenance agreement on an annual basis and, therefore, it was not obligated to purchase more than the two years of maintenance it had already paid for.

A.   **ObjectSpace and Recursion Failed to
Obtain OnStar's Consent to the Assignment.**

As noted above, the terms and conditions applicable to the maintenance agreement provide that ObjectSpace "may not assign or delegate its obligations under this contract without Buyer's prior written consent." Because ObjectSpace <u>did</u> assign its obligations to Recursion, and because OnStar did not give prior, written consent, OnStar is entitled to summary judgment on the breach of contract claim.

1.   **Michigan law governs.**   The General Terms and Conditions provide that the governing law is determined by reference to the Buyer's (<u>i.e.</u>, OnStar's) address. The License Agreement reflects a Troy, Michigan, address for OnStar. Therefore, Michigan substantive law governs this contractual dispute.

2.    <u>**Non-assignment provisions are enforceable.**</u>  Michigan    embraces    the "bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstance, such as a contract in violation of law or public policy." <u>Wilkie v. Auto-Owners Ins. Co.</u>, 664 N.W.2d 776, 782 (Mich. 2003).    In other words, "parties are generally free to agree to whatever specific rules they like." <u>St. Clair Int. Sch. Dist. v. Int. Educ. Ass'n</u>, 581 N.W.2d 707, 722 (Mich. 1998).

The non-assignment clause in the General Terms and Conditions is unambiguous: ObjectSpace "may not assign or delegate its obligations under this contract without Buyer's prior written consent."  Applying Michigan law, the Sixth Circuit recently upheld a summary judgment grounded on a similar provision:  "[t]he anti-assignment clause at issue here prohibits the subcontractor from either assigning rights or delegating responsibilities. . . . There is no ambiguity, and the intent of the parties is clear.  The anti-assignment provision is therefore enforceable." <u>Riley v. Hewlett-Packard Co.</u>, 48 U.C.C. Rep. Serv. 2d 387, 36 Fed. App'x 194, 196 (6th Cir. 2002).  This result is consistent with long-standing Michigan law.  The Michigan Supreme Court has held that "a provision forbidding assignment of contract is an absolute valid restriction where the contract remains executory." <u>Jankowski v. Jankowski</u>, 18 N.W.2d 848, 849 (Mich. 1948).

More recently, the court in <u>Hy King Assocs., Inc. v. Versatech Manuf. Indus., Inc.</u>, 826 F. Supp. 231 (E.D. Mich. 1993) (applying Michigan law) enforced an agreement

providing that "[a]gent shall not assign or transfer this Agreement or any rights or obligations hereunder except with the prior written consent of Principal." Id. at 238. The court noted that "the language of the agreement could not be more clear," id., and concluded that "[b]ecause the agreement was never [validly] assigned, defendant cannot be liable to [assignee]." Id. at 239.[3]

3.    **OnStar Did Not Give "Prior Written Consent".**    The Asset Purchase Agreement between ObjectSpace and Recursion is dated December 20, 2001. By the terms of the Non-Assignment Provision, ObjectSpace was required to obtain OnStar's prior, written consent before completing the asset transfer. However, ObjectSpace never obtained (or even sought) OnStar's consent to the assignment – whether before or after December 20, 2001. [App. at 148-54].

In response to OnStar's discovery request, Recursion produced examples of several other instances in which ObjectSpace sought and obtained other licensees' consents to the transfer. For example, ObjectSpace wrote to the software company, Advanced Micro Devices, in January 2002, notifying AMD that "ObjectSpace, Inc. sold some of its product lines to Recursion Software, Inc., a Texas company. . . . Our records indicate an active agreement, as referenced above, between ObjectSpace, Inc. and your

---

[3] Michigan courts have enforced the exact non-assignment provision at issue in this case. In Pinto v. General Motors Corp., 1999 Mich. App. LEXIS 2172 (Dec. 10, 1999) (granting summary judgment), Nexco and GM contracted for Nexco to provide certain personnel services to GM. Nexco assigned its obligations to its successor-in-interest, Tech/Aid. Id. at *2. Nexco claimed that it obtained GM's oral consent to the assignment. Id. Nonetheless, the court found that Nexco's reliance on any such oral promise was "not reasonable as a matter of law" in light of paragraph 27 of GM's Terms and Conditions, and affirmed summary judgment in favor of GM on the basis that Nexco had failed to obtain GM's "written consent." Id.

company.   ObjectSpace hereby requests your consent to assign this agreement to

Recursion[.]"   [App. at 119-125].   In stark contrast, it is undisputed that neither

ObjectSpace nor Recursion ever sought OnStar's consent:

> **Q:** ***Did Recursion ever ask GM to consent to the assignment***
> ***of the maintenance obligation to Recursion?***
>
> **A:** ***No.***
>
> **Q:** Did Recursion ever, to your knowledge, obtain any
> consent from OnStar to assign the maintenance obligation to
> Recursion?
>
> **A:** No.
>
> * * *
>
> **Q:** Is there any reason that you know of why this type of
> consent could not have been sent to OnStar in January 2002?
>
> **A:** No.

[App. at 26-27].   Counsel for Recursion has represented on the record that – to his

knowledge – all such "request for consent" letters in Plaintiff's possession (which include

no such letter addressed to GM or OnStar) have been produced in discovery.   [App. at

16].

**4.      Recursion Cannot Overcome the "Non-Waiver" Provision.**

Recursion has indicated that it intends to argue that OnStar somehow waived its

right to rely on the "non-assignment" provision.   To succeed in this argument, Recursion

will of course also have to overcome the following contractual term:

> **26.      NO IMPLIED WAIVER:**
> The failure of either party at any time to require performance by the other party
> of any provision of this contract shall in no way affect the right to require such

---

> performance at any time thereafter, nor shall the waiver of either party of a breach of any provision of this contract constitute a waiver of any succeeding breach of the same or any other provision.

The Michigan Supreme Court very recently considered this issue in <u>Quality Prods. and Concepts Co. v. Nagel Precision, Inc.</u>, 666 N.W.2d 251 (Mich. 2003). The court held that, although "parties to a contract are free to mutually waive or modify their contract notwithstanding a written modification or anti-waiver clause," the bar is exceptionally high. <u>Id.</u> at 253.

The court explained as follows:

> This mutuality requirement is satisfied where a waiver or modification is established <u>through clear and convincing evidence</u> of a written agreement, oral agreement, or affirmative conduct establishing mutual agreement to modify or waive the particular original contract. <u>In cases where a party relies on a course of conduct to establish waiver or modification, the law of waiver directs our inquiry</u> and the significance of written modification and anti-waiver provisions regarding the parties' intent is increased.

<u>Id.</u> at 253 (emphasis supplied). Thus, Recursion must establish that Recursion and OnStar mutually agreed to waive both the "non-assignment" and "no implied waiver" provisions in the contract. Recursion has the burden of establishing this waiver by clear and convincing evidence.

As demonstrated in the affidavit of Bruce Radloff, OnStar's Chief Technology Officer, the computer programmers, technicians and engineers who normally communicated with ObjectSpace on day-to-day matters lacked any authority to consent to the assignment to Recursion or to waive OnStar's contractual rights. [App. at 149-50]

As a matter of law, therefore, no such waiver occurred.[4]   Alternatively, there is insufficient evidence for a reasonable jury to conclude by clear and convincing evidence that OnStar knowingly and intentionally waived its contractual consent rights. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-50 (1986); <u>see, e.g.</u>, <u>Vaughan v. Hartford Cas. Ins. Co.</u>, 277 F. Supp. 2d 682, 684 (N.D. Tex. 2003) (non-moving party "may not rest on mere allegations or denials of pleading, but must set forth specific facts ... and identify specific evidence in the record and articulate the precise manner in which that evidence supports its claims").

Importantly, it is insufficient for Recursion to simply allege that OnStar was aware of the assignment by ObjectSpace and did not object to it.  "<u>Mere knowing silence generally cannot constitute waiver.</u>"  <u>Quality Prods.</u>, 666 N.W.2d at 254.  In <u>Quality Products</u>, the only issue on appeal was whether "defendant's alleged silence in the face of plaintiff's activity . . . constituted a waiver in light of the anti-waiver provision in the contract . . . which purports to prevent silent modification of the written agreement." <u>Id.</u> at 256 (citing the court's order granting leave to appeal, 467 Mich. 895 (2002)).  The court concluded that a contract containing an "anti-waiver" provision could be modified, but cautioned that a party "advancing amendment must establish that the parties mutually

---

[4] Moreover, there is no evidence that any of these lower-level OnStar personnel made any statements or committed any acts that reasonably could constitute either a consent by OnStar or a waiver of the consent requirement.  For example, Recursion has indicated that it may argue "waiver" by Richard Heines, an OnStar employee.  Mr. Heines did not waive this requirement and, in fact, did not have knowledge of the right purportedly being waived.  [App. at 156-57].

intended to modify the *particular* written contract, including its restrictive amendment clauses such as written modification or anti-waiver clauses." Id. at 258.

Waiver, the court noted, is "a voluntary and intentional abandonment of a known right." Id. (citing Roberts v. Mecosta Co. Hosp., 642 N.W.2d 663, 670 n. 4 (Mich. 2002)). The court held that a party urging modification by course of conduct must establish – through clear and convincing evidence – that the other party "relying on the terms of the prior contract, knowingly waived enforcement of those terms[.] . . . Any clear and convincing evidence of conduct must overcome not only the substantive portions of the previous contract allegedly amended, <u>but also the parties' express statements regarding their own ground rules for modification or waiver as reflected in any restrictive amendment clauses.</u>"    Id. at 258-59 (emphasis supplied).    A plaintiff in Recursion's position must "establish clear and convincing evidence of a mutual agreement to waive . . . the written modification and anti-waiver clauses." Id. at 260. This is a requirement that Recursion has not – and *cannot* – satisfy.

In short, the contract between ObjectSpace and OnStar clearly gives OnStar the affirmative right to give or withhold prior, written consent to the purported assignment of the maintenance obligation. ObjectSpace failed to either request or obtain this consent. The terms of the ObjectSpace/OnStar contract also give OnStar the right to insist on only written contractual modifications, and to avoid implied waiver – and Recursion cannot produce any evidence sufficient to meet Michigan's heightened standard for "course of

conduct waiver" in light of these provisions.  Therefore, Recursion's cause of action for breach of contract fails as a matter of law in light of ObjectSpace's prior breach.

**B.**    **The Maintenance Obligation Never Transferred to Recursion.**

As set forth above, Recursion, rather than ObjectSpace, has sued OnStar for breach of the maintenance obligation.  However, by the terms of the Asset Purchase Agreement between ObjectSpace and Recursion, the contract (and thus the cause of action for its breach) never transferred to Recursion.  OnStar is therefore also entitled to summary judgment based on Recursion's lack of standing.

The Asset Purchase Agreement provides, in pertinent part, as follows:

> To the extent that any assignment . . . of Intangible Personal Property . . . would require the consent or waiver of the issuer thereof or the other party thereto or any third party, which has not already been obtained, . . . this Agreement shall not constitute an assignment . . . unless and until such consent or waiver is obtained.

[App. at 69].   Of course, as discussed above, the contract between OnStar and ObjectSpace requires ObjectSpace to obtain OnStar's written consent prior to any assignment.

It is clear that OnStar never consented to the assignment by ObjectSpace.  In fact, even, Paul Lipari, formerly the C.F.O. of ObjectSpace and now the Chief Executive Officer of Recursion, testified that Recursion never asked OnStar to consent – and never obtained OnStar's consent – to the assignment of the maintenance obligation from ObjectSpace to Recursion.   [App. at 26-27].   Similarly, OnStar's Chief Technology Officer has confirmed that no such consent was sought or obtained.   Nor is there legally

sufficient evidence that OnStar intentionally waived its consent rights. Accordingly, since neither ObjectSpace nor Recursion ever obtained "the consent or waiver" of OnStar, the Asset Purchase Agreement does "not constitute an assignment" of the maintenance obligation and Recursion lacks standing as a matter of law to bring any claims based upon that contract.

C.    **OnStar Properly Elected to Discontinue Maintenance of Voyager.**

Even if it is assumed, arguendo, that Recursion is a proper assignee of ObjectSpace's maintenance obligations to OnStar, Recursion's claims still fail because OnStar properly elected not to purchase a third year of maintenance. As previously noted, the terms of the June 30, 1999, Software License (which is specifically referenced in the December 1999 purchase order) expressly required ObjectSpace to provide free software maintenance and support during the 90-day warranty period. [App. at 44-45]. Thereafter, such services were required to be provided only "upon Licensee's [OnStar's] request at the applicable charges set forth in the purchase order." [Id.]. Thus, the parties explicitly agreed that future maintenance services would only be purchased *if requested by OnStar* and that, therefore, OnStar had the option to cancel (or, at a minimum, elect not to renew) any software maintenance.

This understanding is reflected in the language used in the Statement of Work attached to the December purchase order. [App. at 58]. In the Statement of Work, the parties expressly provided that the perpetual license of the Voyager software is "non-cancelable, non-refundable, and non-transferable." [Id.]. Similarly, OnStar's purchase of

computer consulting services included in the Statement of Work is "non-cancelable, non-refundable, and non-transferable." [Id.]. In contrast, the terms applicable to OnStar's purchase of software maintenance for Voyager has no such constraints. Instead, the provision addressing maintenance simply states that the price will be $350,000.00 pre-paid annually. It does not contain any statement that maintenance must be purchased for a particular number of years and, more importantly, it does not in any way indicate that the purchaser cannot choose to cancel or discontinue the maintenance services at any time. As shown by the other provisions of the Statement of Work, the parties clearly understood how to make ObjectSpace's services "non-cancelable." The omission of those words in connection with the maintenance services plainly indicates that the parties intended to treat the purchase of software maintenance differently.

This is also consistent with the testimony of Mr. Norris, the former CEO of ObjectSpace. Norris, who was personally involved in negotiating the December 1999 transaction with OnStar, testified that OnStar had the "option" to renew the maintenance agreement on an annual basis and could either choose to continue the maintenance or not. [App. at 12-14]. Norris also confirmed that such an arrangement is "pretty typical" in the computer software industry. [Id.].

In this case, after buying two years' worth of maintenance from ObjectSpace in 2000 and 2001, it is undisputed that OnStar decided not to purchase a third year of maintenance for the Voyager software. [App. at 158]. Thus, by exercising the option that

Norris concedes OnStar possessed not to purchase further maintenance in 2002, OnStar had no obligation to pay Recursion for that period. Accordingly, Recursion's claims for breach of contract and copyright infringement based upon the non-payment of maintenance fees fails as a matter of law.

## VI. <u>CONCLUSION</u>

For each of the foregoing reasons, Defendants' motion for partial summary judgment should be granted in its entirety and judgment should be entered in favor of Defendants with respect to Counts Three and Six of Plaintiff's First Amended Complaint.

Respectfully submitted,

**FIGARI DAVENPORT & GRAVES, L.L.P.**

By: _____

A. Erin Dwyer
State Bar No. 06302700
Parker D. Young
State Bar No. 22204050
John M. Barcus
State Bar No. 24036185

3400 Bank of America Plaza
901 Main Street
Dallas, Texas 75202
TEL: 214-939-2000
FAX: 214-939-2090

ATTORNEYS FOR DEFENDANTS
GENERAL MOTORS CORPORATION
AND ONSTAR CORPORATION

## <u>CERTIFICATE OF SERVICE</u>

The foregoing instrument was sent by certified mail, return receipt requested, to David H. Harper, Haynes and Boone, L.L.P., 901 Main Street, Suite 3100, Dallas, Texas 75202-3789, on the 13th day of November, 2003.

Parker D. Young